## IN THE
## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| VANESSA CAMERON, D.O.,<br>Plaintiff,<br><br>v.<br><br>TEVERBAUGH CROLAND AND<br>MUELLER OB/GYN ASSOCIATES,<br>S.C., LORI A. TEVERBAUGH, M.D.,<br>JOSHUA A. CROLAND, M.D., and<br>JOHN C. MUELLER, M.D.,<br>Defendants. | Case No. 1:24-cv-01432-JEH-RLH |

### Order

Now before the Court are Plaintiff's Motion for Partial Summary Judgment (D. 46) and Defendants' Motion for Partial Summary Judgment (D. 47).[1]  For the reasons set forth *infra*, the Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART and the Defendants' Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART.

### I

On October 30, 2024, Plaintiff Vanessa Cameron, D.O., filed her Complaint (D. 1) against Defendants Teverbaugh, Croland, and Mueller OB/GYN Associates, S.C. (TCM), Lori Teverbaugh, M.D., Joshua A. Croland, M.D., and John C. Mueller, M.D., alleging they violated the Illinois Wage Payment and Collection Act (IWPCA), 820 Ill. Comp. Stat., 115/1 *et seq.* (Counts I through IV) and breached Dr. Cameron's employment contract, including the implied covenant of good faith

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

1

and fair dealing (Count V).  Specifically, Dr. Cameron alleged the Defendants never paid any annual bonuses pursuant to the parties' 2016 employment agreement (2016 Agreement), failed to increase Dr. Cameron's base salary according to the schedule set forth in the 2016 Agreement, never paid Dr. Cameron any shareholder distributions or dividends, and unilaterally and wrongfully decreased Dr. Cameron's salary by about 50 percent for several weeks in April and May 2020.  Dr. Cameron requested compensatory damages, statutory damages, interest, and costs, including reasonable attorneys' fees as well as specific performance.[2]

## II

The undisputed facts are as follows.[3]  Dr. Cameron is a board-certified physician who began her employment with Defendant TCM in 2013.  Dr. Cameron signed the 2016 Agreement on or about January 1, 2016 which was set to expire December 31, 2020.  Drs. Croland and Teverbaugh were aware of the obligations in the 2016 Agreement and negotiated its terms.  The 2016 Agreement contained a section entitled "3.4 Compensation for Services of Physician."  Section 3.4 reads as follows:

> 3.4 Compensation for Services of Physician.  Physician is an exempt employee for the purpose of the Fair Labor Standards Act.  As Physician's compensation for all duties and obligations set forth herein the Corporation shall pay to Physician a contract fee computed at the annual rate of $300,000.00, payable in accordance with the Corporation's biweekly payroll process.  Assuming Physician's performance of services under this Agreement continues to be satisfactory to the Corporation, which the Corporation will review and determine on an annual basis, the Corporation will increase Physician's annual salary by $52,000 on January 1, 2017, and thereafter $42,667 each year, until such time as Physician's annual

---

[2] The Plaintiff voluntarily withdrew her Count VI alleging a civil conspiracy.  *See* Pl.'s Resp. to Mot. to Dismiss (D. 15 at ECF p. 1, fn. 1).

[3] Taken from the parties' respective Motions for Partial Summary Judgment.

salary is at $480,000. Part of the Corporation's annual review and determination of salary increase will be whether Physician's performance is at a level that is expected of the Corporation's existing shareholders.

In addition, the Corporation shall:

\* \* \*

d. Physician shall be eligible for an annual bonus, the amount of which will be based on two calculations: i) a reconciliation of the Physician's individual annual financial performance, as reasonably determined by the Corporation's outside accountant; and ii) a reconciliation of the Corporation's annual financial performance, as reasonably determined by the Corporation's outside accountant, of which Physician shall be entitled to a 12.5% share. The bonus amount shall be paid out equally over a 24 month period.

e. Simultaneous with the execution of this Agreement, Physician is subscribing for 48 shares of the Corporation. Assuming Physician is still employed pursuant to this Agreement at the time, Physician shall be entitled to subscribe for an additional 48 shares as of January 1, 2017, January 1, 2018, January 1, 2019 and January 1, 2020, for a total of 240 shares of the Corporation.

Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF pp. 4-5). Dr. Cameron's expert, Sarah McGuire, CPA, asserted that, based upon her calculations, Dr. Cameron was ultimately paid the following yearly salaries by TCM: $300,000 (2016); $354,476 (2017); $395,832 (2018); $415,128 (2019); and $174,906 (2020). Ms. McGuire asserted, based upon calculations which utilized Financial Summary Reports prepared by TCM, Dr. Cameron's net receipts for the at-issue fiscal years were as follows: $455,524 (2016); $742,877 (2017); $761,886 (2018); $793,344 (2019); and $407,471 (2020). Determination of annual salary increases for Dr. Cameron under Section 3.4 of the 2016 Agreement was based, in part, upon whether Dr. Cameron's

performance was a level expected of TCM's then-existing shareholders (Drs. Teverbaugh, Croland, and Mueller).

Dr. Teverbaugh was, at times relevant to Dr. Cameron's Complaint, a shareholder and the president of TCM. Dr. Croland was, at times relevant to Dr. Cameron's Complaint, a shareholder of TCM. Between January 2016 and December 2020, Drs. Croland and Teverbaugh had the ability to direct and cause Defendant TCM to pay Dr. Cameron all earned wages, including her salary, annual bonuses, and compensation from any shares in TCM. When annual reviews of physicians were performed, it was typically Drs. Teverbaugh and Croland who participated in the meetings. Defendant TCM considered Dr. Cameron's performance "satisfactory," and her patients trusted her. No written performance reviews were provided. Drs. Croland and Teverbaugh were responsible for paying Dr. Cameron's salary. TCM did not transfer any shares to Dr. Cameron. TCM did not pay Dr. Cameron any form of compensation for her shares.

TCM and Drs. Croland and Teverbaugh made the decision to decrease Dr. Cameron's bi-monthly salary of $16,153.85 to $8,076.93 for three pay periods and $12,115.38 for one pay period, resulting in a total underpayment of $28,269.23, without Dr. Cameron's consent in April and May 2020. Dr. Cameron informed the Defendants she objected to their reduction of her salary in April and May 2020 and requested that TCM pay the salary the Defendants reduced. TCM made a partial payment of Dr. Cameron's unpaid salary of $9,329.00 in August 2020 and paid the remainder of $18,940.23 in February 2021. The Defendants have not paid any statutory penalties to Dr. Cameron related to the Defendants' reduction of her salary in 2020.

Dr. Croland planned for Dr. Cameron to become a partner through "sweat equity." TCM drafted a subscription agreement for Dr. Cameron to become a TCM

shareholder.    TCM drafted an amendment to the company's stockholder agreement to add Dr. Cameron as a shareholder.  On December 22, 2015, Tyler Petersen sent Janell Pettry, TCM's Office Manager, an email containing a draft subscription agreement for Dr. Cameron to receive shares in TCM.  Ms. Pettry does not recall providing the draft to Dr Cameron.  TCM has no direct evidence or knowledge of any TCM agent providing any subscription agreement to Dr. Cameron between 2015 and December 2020.  TCM knew the president of TCM needed to sign Dr. Cameron's subscription agreement for it to be effective, and TCM knew that its president never signed any subscription agreement.  Dr. Cameron testified in her deposition that she was never issued any shares in TCM.

On April 13, 2020, Dr. Cameron provided 60-days' written notice to Defendant TCM that she was resigning from her employment with TCM and that her last day of employment with TCM would be June 12, 2020.

III

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323-24.  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial.  *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997).  "[A] party moving for summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof."  *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999).  However, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]."  *Id*. at 252.

Here, the Court simultaneously considers the parties' respective Motions for Partial Summary Judgment which were filed on the same day.  This is particularly appropriate given the fact that resolving one of the instant Motions would necessarily resolve the other and vice versa.[4]

A

Dr. Cameron seeks summary judgment as to the Defendants' alleged failure to timely pay her salary in 2020, to increase her salary between 2016 and 2020, to pay her bonuses between 2016 and 2020, to provide her with any shares, and to provide any compensation related to such shares between 2016 and 2020, all pursuant to the 2016 Agreement, Section 3.4.  Meanwhile, the Defendants argue

---

[4] In her Motion for Partial Summary Judgment (D. 46), Dr. Cameron requests summary judgment as to liability on Counts I through V, leave to submit a petition for interest and attorneys' fees for the Defendants' alleged violation of Section 3.4 of the 2016 Agreement, and to set this matter for trial on damages as to Section 3.4(d) and 3.4(e) of the 2016 Agreement.  In their Motion for Partial Summary Judgment (D. 47), the Defendants request summary judgment with respect to Counts I through IV of the Plaintiff's Complaint, and they additionally state they are entitled to partial summary judgment with respect to the allegations of Count V of the Plaintiff's Complaint which attempt to invoke the covenant of good faith and fair dealing.

they are entitled to summary judgment in their favor as to those same issues.  They also seek summary judgment on Count IV against Dr. Mueller, arguing it cannot reasonably be disputed that he was not involved in negotiation of Dr. Cameron's 2016 Agreement, nor did he participate in any discussions regarding her compensation as a physician for TCM.  The Defendants argue they are entitled to summary judgment on Count V with respect to Dr. Cameron's Complaint alleging breach of the covenant of good faith and fair dealing.

The IWPCA provides, in relevant part, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILL. COMP. STAT. 115/5.  "Final compensation" is defined as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.  820 ILL. COMP. STAT. 115/2.  To establish a claim under the IWPCA, a plaintiff must show that wages or final compensation is due to her as an employee from an employer under an employment contract or agreement.  *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1058 (Ill. App. Ct. 2005).  The parties do not dispute that the 2016 Agreement was an employment agreement, that TCM was an "employer," and that Dr. Cameron was an "employee."

The IWPCA further provides, in relevant part, that:

> Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed . . . in a civil action . . . the amount of any such underpayments and damages of 5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid . . . In a civil action, such employee shall also recover costs and all reasonable attorney's fees.

820 ILL. COMP. STAT. 115/14(a).  At the time the Plaintiff was underpaid in April and May 2020, that statute provided for interest penalties of the underpayment of 2% each month.  820 ILL. COMP. STAT. 115/14(a) (2021).

1

With regard to Dr. Cameron's decrease in salary in April and May 2020, during the 2020 COVID-19 pandemic, she argues the Defendants' late payments in August 2020 and February 2021 are admissions that they violated Section 3.4 of the 2016 Agreement and the IWPCA, and so the Defendants owe interest and attorneys' fees.  The Defendants counter that by making her claim for interest and fees in a summary manner, Dr. Cameron is purposefully omitting the fact that her attorney never made a demand on the Defendants for payment of accrued interest or attorney fees under the IWPCA.

The Defendants point to evidence of the parties' attorneys' exchange of correspondence in 2021 regarding the "temporary reduction" in Dr. Cameron's salary, specifically Defendants' attorney's statement that a check made payable to Dr. Cameron was being sent "for purposes of settling the present dispute between our clients regarding the salary paid to Dr. Cameron in 2020."  Defs.' Resp. Ex. 15 (D. 54-1 at ECF pp. 1-2).  They also point to Dr. Cameron's attorney's email which made no demand for payment of interest and fees under the IWPCA, and the fact that Dr. Cameron otherwise did not make such a demand for accrued interest and fees until she filed her complaint in state court on July 26, 2021.  They also take issue with Dr. Cameron's alleged failure to identify her damages and failure to produce any evidence on how she calculates her damages.  In reply, Dr. Cameron argues the Defendants rely on inadmissible Federal Rule of Evidence 408 communications, she points out there is no evidence that the Defendants' late

8

payment included interest penalties or attorneys' fees, and the Defendants rely on inapplicable authority regarding the award of interest and attorneys' fees.

As an initial matter, the Court need not exclude from its consideration the parties' discussions regarding the belated payment of Dr. Cameron's salary. "In deciding whether evidence should be excluded under Rule 408, 'courts must consider the spirit and purpose of the rule and decide whether the need for the settlement evidence outweighs the potentially chilling effect on future settlement negotiations.'" *Donovan v. Quade*, 830 F. Supp. 2d 460, 470 (N.D. Ill. 2011) (quoting *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005)). Here, the parties' settlement discussions are irrelevant insofar as Section 115/14 is concerned, given that the IWPCA provides:

> In case of a dispute over wages, the employer shall pay, without condition and within the time set by this Act, all wages or parts thereof, conceded by him to be due, leaving to the employee all remedies to which he may otherwise be entitled as to any balance claimed. The acceptance by an employee of a disputed paycheck shall not constitute a release as to the balance of his claim and any release or restrictive endorsement required by an employer as a condition to payment shall be a violation of this Act and shall be void.

820 ILL. COMP. STAT. 115/9. In other words, Dr. Cameron's failure to insist upon the payment of statutory interest and attorneys' fees at the time of the late payment of her wages does not mean she is not entitled to them now. *See, e.g., Schultze v. ABN AMRO, Inc.*, 83 N.E.3d 1053, 1062 (Ill. App. Ct. 2017) ("But settlement of claims in the form of a release signed by an employee relating to an employer's violation of the Act is not permissible. 820 ILCS 115/9 (West 2008)."). The Defendants provide no authority in support of their position that there are no amounts remaining due to Dr. Cameron for the 2020 temporary salary reduction because she did not previously demand accrued interest and attorneys' fees until she filed her state court complaint.

The undisputed facts are that TCM and Drs. Croland and Teverbaugh made the decision to decrease Dr. Cameron's bi-monthly salary of $16,153.85 to $8,076.93 for three pay periods and $12,115.38 for one pay period, resulting in a total underpayment of $28,269.23, without Dr. Cameron's consent in April and May 2020. Dr. Cameron informed the Defendants she objected to their reduction of her salary in April and May 2020 and requested that TCM pay the salary the Defendants reduced. TCM made a partial payment of Dr. Cameron's unpaid salary of $9,329.00 in August 2020 and paid the remainder of $18,940.23 in February 2021. Accordingly, Dr. Cameron is entitled to summary judgment as to the Defendants' liability for accrued interest and attorneys' fees under the Penalties section of the IWPCA, 820 Ill. Comp. Stat. 115/14. The Defendants' argument that they have no idea what Dr. Cameron seeks in damages is disingenuous. Dr. Cameron's expert report contains damages calculations, and her earlier Rule 26(a)(1) disclosures and responses to the Defendants' interrogatories provide enough detail to defeat a claim of ignorance. Pl.'s Mot. Summ. J. Ex. 29 (D. 46-31); Defs.' Resp. Ex. 23 (D. 54-10 at ECF p. 4); Defs.' Resp. Ex. 24 (D. 54-11 at ECF pp. 15-16). In any event, Dr. Cameron has made abundantly clear that her Motion for Partial Summary judgment seeks summary judgment only as to liability for damages/interest/attorneys' fees, to be followed by her filing a fee petition to recover attorney's fees and interest, and a trial on damages.

**2**

With regard to the salary increases specified in the first paragraph of Section 3.4 of the 2016 Agreement, Dr. Cameron points to the Defendants' Answer (D. 21) in which they "admit that Plaintiff perform [sic] satisfactory work for TCM . . . ." Defs.' Answer (D. 21 at ECF p. 6). She argues nothing in the 2016 Agreement contemplated the partial salary increases she received, though such increases in 2019 and 2020 act as admissions that her performance was "satisfactory" as

required by the 2016 Agreement for increases in her salary those two years. Per the Defendants, Section 3.4 does not promise or otherwise guarantee Dr. Cameron an annual salary increase in the full amount listed and described. They argue the plain and unambiguous terms of Section 3.4 clearly provide Defendant TCM with discretion in determining the amount of Dr. Cameron's annual salary increase based on whether or not her level of performance was at the level expected of the Corporation's existing shareholders.

"Traditional principles of contract interpretation require a court, when construing a contract, to ascertain and give effect to the intent of the parties." *W.W. Vincent and Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 966 (Ill. App. Ct. 2004). "Generally, where there is no ambiguity, courts will look to the [contract] itself as the only criterion of the intention of the parties." *Shelton v. Andres*, 478 N.E.2d 311, 314 (Ill. 1985). "'Intent' refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware." *Vill. of S. Elgin v. Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 670 (Ill. App. Ct. 2004).

Here, there is not and cannot be any dispute as to what the language of Section 3.4 provides with regard to Dr. Cameron's salary increases. Section 3.4 states, in pertinent part, "Assuming Physician's performance of services under this Agreement continues to be satisfactory to the Corporation, which the Corporation will review and determine on an annual basis, the Corporation *will* increase Physician's annual salary [as set forth herein]." Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF p. 4). The plain language does not, contrary to the Defendants' argument, provide the Defendants with discretion in determining the amount of Dr. Cameron's annual salary increases. The amounts are set forth in definite terms: "*will* increase Physician's annual salary by $52,000 . . and thereafter $42,667 each

11

year, until such time as Physician's annual salary *is* at $480,000."  *Id*. (emphasis added).  It is undisputed that Dr. Cameron's performance was "satisfactory" to the Defendants throughout the relevant time period.  *See, e.g.*, Pl.'s Mot. Summ. J. Ex. 8 (D.46-10 at ECF p. 12) at 40:7-9.  That, coupled with the plain language of Section 3.4 of the 2016 Agreement, means Dr. Cameron is entitled to summary judgment as to the Defendants' liability for violating the IWPCA by failing to pay Dr. Cameron's full, promised salary in 2019 and 2020.

The Defendants underscore the portion of Section 3.4 which provides, "Part of the Corporation's annual review and determination of salary increase will be whether Physician's performance is at a level that is expected of the Corporation's existing shareholders."  Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF p. 4).  That portion cannot be read in isolation, and instead "must be drawn from the context in which it is used."  *Asta, L.L.C. v. Telezygology, Inc.*, 629 F. Supp. 2d 837, 844 (N.D. Ill. 2009).  Read together with the immediately preceding sentence (quoted above), this portion of Section 3.4 merely provides what "satisfactory" means and does not provide the option of deviating from the amounts of each year's salary increase.  Nowhere in Section 3.4 are partial salary increases mentioned or specified.  "If the parties had meant that [TCM have the discretion to evaluate Plaintiff's performance *and* to determine *the amount of her annual salary increase based on* whether her performance *was satisfactory and* at a level expected of the existing shareholders of TCM], they could easily have provided that in their agreement."  *Id*. at 845 (emphasis added).  But they did not, and "[i]t is not for a court to rewrite a party's agreement."  *Id*.

### 3

Next, Dr. Cameron argues the 2016 Agreement uses unequivocal language in Section 3.4(d) to promise her annual bonuses, and so the Defendants violated the IWPCA by failing to pay her any annual bonus between 2016 and 2020.  She

argues further that the Defendants admit her performance was "satisfactory," and TCM failed to have its outside accountant conduct a "reconciliation," she further sought her bonus and requested the underlying financial data, and Dr. Teverbaugh explicitly directed a TCM employee, Ms. Pettry, not to give Dr. Cameron the data.  The Defendants dispute those statements, countering that Dr. Cameron was only eligible for an annual bonus under Section 3.4(d) of the 2016 Agreement if she met the eligibility requirements set forth in Section 3.4(d), which she did not.  Relying upon the word "eligible," in Section 3.4(d), the Defendants argue the annual bonus was only discretionary and therefore not an "earned bonus" subject to the jurisdiction of the IWPCA.  As for the term "shall" that appears in Section 3.4(d), the Defendants note additional references to "shall" all follow the conditional language of eligibility based upon an assessment of both Dr. Cameron's and the corporation's financial performance.

Illinois courts and federal courts interpreting the IWPCA define "earned bonus" as one which an employee was unequivocally promised by her employer, not one that is discretionary or gratuitous.  *See McLaughlin v. Sternberg Lanterns, Inc.*, 917 N.E.2d 1065, 1071 (Ill. App. Ct. 2009) (agreeing that where no unequivocal promise was made, an employee is not entitled to any part of the bonus pursuant to 820 ILCS 115/2 and discussing 56 Ill. Admin. Code § 300.500); *Tao v. Simplex Invs., LLC*, No. 1-21-1040, 2022 WL 3535991, at *4 (Ill. App. Ct. Aug. 18, 2022) (unpublished opinion); *Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015) (contrasting that where there was no unequivocal promise that a bonus would be paid, courts denied recovery under the IWPCA); *and Stone v. Corrigan Bros., Inc.*, No. 20-cv-261, 2021 WL 8017852, at *6 (S.D. Ill. Apr. 28, 2021) ("Only bonuses that are guaranteed to be paid, are covered under the IWPCA.").  An Illinois Department of Labor Regulation, 56 Illinois Administrative Code § 300.500, provides in relevant part:

13

> An employee has a right to an earned bonus when there is an unequivocal promise by the employer and the employee has performed the requirements set forth in the bonus agreement between the parties and all of the required conditions for receiving the bonus set forth in the bonus agreement have been met.

ILL. ADMIN. CODE tit. 56, § 300.500(a) (2024); *see also Tao*, 2022 WL 3535991, at *4 (giving substantial weight and deference to the Illinois Department of Labor's regulations construing the IWPCA).  Further:

> A discretionary bonus is when the terms associated with the earning of the bonus are indefinite or uncertain, such as bonus being upon a positive evaluation of the "employee's performance" and not when the earning of a bonus is based on objective factors such as length of service, attendance or sign-on or relocation incentives.

ILL. ADMIN. CODE tit. 56, § 300.500(d).

As Dr. Cameron points out, in the Court's March 18, 2025 Order (D. 20) denying the Defendants' Motion to Dismiss (D. 8), the Court, after analysis, concluded that after giving the 2016 Agreement a fair reading, Dr. Cameron sufficiently alleged she was entitled to an "earned bonus" (versus a discretionary one) under the IWPCA.  There, the Court considered the use of the word "eligible" alongside three uses of the word "shall" in Section 3.4(d).  Mar. 18, 2025 Order (D. 20 at ECF p. 7).  The Court:  noted the calculation of the bonus was to be conducted by TCM's outside accountant (emphasizing "outside") using objective factors; the Defendants' cited cases did not establish the language of Section 3.4(d) was discretionary; distinguished a case wherein the bonus was due the employee based upon profitability (emphasizing "based") compared with this case where TCM's annual financial performance would be used, in part, to calculate the amount (emphasizing "the amount") of the bonus; and pointed out that Section 3.4(d) was silent with regard to any subjective (emphasizing "subjective") consideration of Dr. Cameron's job performance.  *Id*. at p. 8.

14

Now, the Defendants argue they are entitled to summary judgment because, again according to them, Section 3.4(d) does not constitute an "unequivocal promise," and so Dr. Cameron cannot pursue her IWPCA claim for any unpaid "earned bonus." They cite several of the cases they did previously in their Motion to Dismiss, and they cite others including *McLaughlin* and *Kemp v. Leidos, Inc.*, No. 18-cv-3167, 2022 WL 748489 (C.D. Ill. Mar. 11, 2022), in an attempt to illustrate how Section 3.4(d) of the 2016 Agreement provided for nothing more than a discretionary bonus. With regard to the cases the Court previously analyzed and determined did not establish the language of Section 3.4(d) as discretionary, the Court incorporates herein its reasoning in the March 18, 2025 Order. In *McLaughlin*, the agreement's bonus provision stated:

> Your base salary is $100,000 per year with a review in 12 months. The sales performance bonus is based on the following program:
> You will earn a bonus of $2,000 for every 1% increase in released incoming orders, thus:
> If Incoming Sales increase 5% per year, your Bonus will be $10,000, or
> If Incoming Sales increase 10% per year, your Bonus will be $20,000, or
> If Incoming Sales increase 15% per year, your Bonus will be $30,000, or
> If Incoming Sales increase 20% per year, your Bonus will be $40,000.

*McLaughlin*, 917 N.E.2d at 1066. The explicit "If/then" explanation for bonus amounts in *McLaughlin* does not appear in Section 3.4(d) of the parties' 2016 Agreement here. As this Court already explained, Section 3.4(d)'s plain terms provide for the method in which the bonus amount will be calculated, not the method to be used to determine whether any bonus would even be paid. The *McLaughlin* bonus provision provided the latter. In *Kemp*, the Program Memo there stated:

> We [the defendant] have established a program to incentivize a small group of Business Development staff for FY16 in order to reward your

15

contributions to the business's success.  As a key member of the BD team, you are eligible to participate in this program . . . Participation in the FY16 BD Incentive Program *does not guarantee* a payout or change the at-will nature of your employment.

2022 WL 748489, at *1 (emphasis added).  The *Kemp* court explained the foregoing language "alone signals that Defendant was not offering an 'unequivocal promise' that Plaintiff would receive a bonus payment."  *Id*. at *5.  There, the Program Memo went on to separately state how "any payout" would be calculated, "including that the 'formula will be weighted 80% toward Individual Goals . . . with the remaining 20% based upon Organizational Goals.'"  *Id*.  Here, there is only an explanation as to how Dr. Cameron's annual bonus would be calculated, and no express statements as to a guarantee or lack thereof to a bonus in the first place.  The *Kemp* court additionally highlighted use of the word "eligibility," explaining eligibility is no guarantee.  *Id*.  But here, *unlike* in *Kemp*, the word "eligible" is not followed by express conditional language, and that distinction underscores *Kemp*'s further unpersuasiveness.

Try as they might, via case law and persistent arguments, to portray Section 3.4(d) of the 2016 Agreement as stating nothing more than the possibility of an annual bonus, the Defendants' attempts fail.  *McLaughlin* and *Kemp* illustrate the following point quite well:  "A presumption exists against provisions that easily could have been included in the contract but were not."  *JF Enters., LLC v. Fifth Third Bank*, 824 F. Supp. 2d 818, 825 (N.D. Ill. 2011) (citing *Gallagher v. Lenart*, 854 N.E.2d 800, 807 (Ill. App. Ct. 2006)).  On its face, particularly given the integration clause which provides the 2016 Agreement is "the entire Agreement between the parties and contains all of the agreements between the parties with respect to the subject services herein[,]" the 2016 Agreement purports to be a complete expression of the parties' entire agreement.  Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at

16

ECF p. 10).  Accordingly, the Court "will not add another term about which the agreement is silent." *JF Enters., LLC*, 824 F. Supp. 2d at 825. Dr. Cameron is entitled to summary judgment in her favor as to the Defendants' liability for their failure to pay her "earned bonuses" for 2016, 2017, 2018, 2019, and 2020.

**4**

As for Section 3.4(e) of the 2016 Agreement, regarding Dr. Cameron subscribing for shares of TCM, Dr. Cameron argues that the Defendants' failure to provide shares to her violated the IWPCA.  The Defendants argue that the enforcement of alleged shareholder rights and/or remedies is well outside the scope of jurisdiction of the IWPCA, as the profits of a company distributed to its shareholders are corporate assets and not wages due under any employment agreement, such that the IWPCA does not apply.  The parties cite cases in support of their respective positions.  The Court need not delve into the cited case law.  Dr. Cameron's Complaint challenged the failure to originally provide her with 48 shares in the corporation and to provide her with an additional 240 shares[5] between January 1, 2017 and January 1, 2020 as well as the failure to pay Dr. Cameron her distributions as a shareholder *only* in her Count V for breach of contract.  *See* Pl.'s Compl. (D. 1 at ECF pp. 20-21).  To the extent Dr. Cameron argues in her Motion for Summary judgment that the Defendants' failure to provide shares to her violated the IWPCA, the Court will not permit her to amend her complaint via a motion for summary judgment.  While a district court retains jurisdiction to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend, it is not required to consider those new

---

[5] The Defendants do not take issue with this number, yet the Court notes that the 2016 Agreement explicitly stated "Dr. Cameron shall be entitled to subscribe for an additional 48 shares as of January 1, 2017, January 1, 2018, January 1, 2019, and January 1, 2020, *for a total of 240 shares* of the Corporation."  Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF p. 5) (emphasis added).  A quick calculation reveals 48 shares plus an additional 48 shares (times 4) equals 240.  The Plaintiff's representations here and in her Complaint (a total of 288 shares) is in error.  The 2016 Agreement provided for an additional 192 shares.

claims. *Ollison v. Gossett*, 136 F.4th 729, 740 (7th Cir. 2025) (quoting *Schmees v. HC1.com, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023)). In light of the Defendants' instant challenge to Dr. Cameron's IWPCA claim based upon shares in TCM (lack of jurisdiction), justice does not require Dr. Cameron to amend her Complaint to add that claim now, essentially one year after the Court's Order on the Defendants' Motion to Dismiss the Complaint and 21 months after the Complaint was originally filed. Therefore, Dr. Cameron is not entitled to summary judgment in this regard. The Defendants are entitled to summary judgment on Counts I-IV to the extent that Dr. Cameron's IWPCA claims do not encompass her allegations as to shares in TCM and shareholder distributions.

**B**

Dr. Cameron argues she is entitled to summary judgment as to the individual Defendants' liability for allowing Defendant TCM to violate the 2016 Agreement and thus violate the IWPCA. The Defendants dispute Dr. Cameron has adduced evidence to sustain her claims against Dr. Mueller, individually.

Section 115/13 of Chapter 820 of the Illinois Compiled Statutes provides:

> In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation.

820 ILL. COMP. STAT. 115/13 (2011).

The Defendants point to Dr. Mueller's deposition during which he testified he did not see the terms of Dr. Cameron's 2016 Agreement prior to the end of the negotiation process, had no input whatsoever on the 2016 Agreement Dr. Cameron signed in 2016, did not recall seeing or discussing the specific provisions of Dr. Cameron's 2016 Agreement aside from within the context of this litigation, had no knowledge as to whether or not Dr. Cameron ever received any bonuses under the

2016 Agreement, did not have any input as to whether or not Dr. Cameron received any bonuses, had no involvement in the decision to modify pay during the COVID-19 pandemic, and likely did not participate in evaluations for Dr. Cameron.  Defs.' Mot. Summ. J. Ex. 8 Mueller Dep. (D. 48-7).  Dr. Cameron points to Dr. Teverbaugh's deposition during which she testified Dr. Cameron's supervisors were all three of TCM's partners, which included Dr. Mueller.  Pl.'s Mot. Summ. J. Ex. 3 (D. 46-5).  Dr. Cameron also points to a text exchange between Dr. Teverbaugh and Dr. Cameron in which the latter asked, "Have you three [Drs. Teverbaugh, Croland, and Mueller] been able to discuss anything regarding the contract proposal for me?"  *Id*. at Ex. 13 (D. 46-15 at ECF p. 5).  She also cites, among other evidence, a text exchange between Drs. Teverbaugh, Croland, and Mueller in which Dr. Mueller wrote on May 15, 2015, "Vanessa [Cameron] has an option she wants to present to us all ready [sic]".  *Id*. at Ex. 15 (D. 46-17 at ECF p. 2).  She cites evidence regarding Dr. Mueller's shareholder status in TCM, including Dr. Teverbaugh's deposition testimony that Dr. Mueller was still a TCM shareholder as of 2022, when he was in the process of a retirement buyout with TCM.  Defs.' Mot. Summ. J. Ex. 7 (D. 48-6 at ECF p. 5) at 14:7-20.

The foregoing makes clear there is a factual dispute as to whether Dr. Mueller meets the definition of "employer" under the IWPCA, and so neither Dr. Cameron nor the Defendants are entitled to summary judgment as to the individual liability of Dr. Mueller.[6]

## C

---

[6] In their Response (D. 58) to Dr. Cameron's Motion for Partial Summary Judgment, the Defendants were silent as to her argument that all three individual Defendants are liable for violating the IWPCA. *See* Pl.'s Mot. Summ. J. (D. 46 at ECF p. 15).  In their own Motion for Partial Summary Judgment (D. 47), the Defendants limited their argument regarding individual liability to only Dr. Mueller.  *See* Defs.' Mot. Summ. J. (D. 47 at ECF pp. 28-30).  The Defendants did, however, refer to their Undisputed Material Facts at pages 10-12 of *their* Motion for Partial Summary Judgment in their responses to Dr. Cameron's summary judgment Motion's Statement of Undisputed Material Facts.  Defs.' Resp. (D. 58 at ECF p. 5).

Dr. Cameron lastly argues that Defendant TCM breached Sections 3.4(d) and (e) of the 2016 Agreement by failing to properly pay increases to Dr. Cameron's salary, failing to pay her annual bonuses, and failing to provide her with shares and the compensation from such shares, all as articulated in the context of her IWPCA claims. To establish a breach of contract under Illinois law, a plaintiff must prove:  1) the existence of a valid and enforceable contract; 2) substantial performance by the plaintiff; 3) a breach by the defendant; and 4) damages. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022). The Defendants argue that Dr. Cameron attempts to utilize the implied covenant of good faith and fair dealing to create a new and/or independent contractual obligation with respect to her allegedly owed compensation, including annual bonuses. They additionally argue that Dr. Cameron's Complaint attempts to use the implied covenant of good faith to modify the 2016 Agreement so that it can be read as "entitling" her to compensation beyond what is expressed in the Agreement itself. From there, the Defendants' argument dovetails with their arguments as to Dr. Cameron's IWPCA claims. For the reasons already articulated herein, Dr. Cameron is entitled to summary judgment on Count V for breach of contract as to TCM's liability for its breach of Sections 3.4 (first paragraph regarding salary) and 3.4(d) of the 2016 Agreement.

The Court rejects the Defendants' contentions regarding the implied covenant of good faith and fair dealing; Dr. Cameron did *not* include it in her Complaint as an independent cause of action. *See Cohn v. Guaranteed Rate Inc.*, 130 F. Supp. 3d 1198, 1210 (N.D. Ill. 2015) ("Illinois law, however, does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing.") (citing *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126 (Ill. 2001)). Rather, Dr. Cameron alleged TCM's failure to pay her owed compensation violated the covenant where TCM failed to direct its accountant to conduct the

reconciliation set forth in Section 3.4(d) of the 2016 Agreement. "The covenant of good faith requires that a party vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties." *N. Tr. Co. v. VIII S. Michigan Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995). The Defendants' "gotcha!" attempt is unconvincing; Dr. Cameron did not assert the covenant of good faith and fair dealing required TCM to pay her bonuses such that she admits the bonuses were discretionary in nature which would further undercut (per Defendants) her IWPCA claims. Her Complaint elaborated that TCM's shortcoming, its breach, was in it failing to exercise its discretion to retain an accountant to conduct a reconciliation in order to calculate Dr. Cameron's annual bonuses. In any event, Illinois appellate courts, without reference to "discretion," have explained, "The duties of good faith and fair dealing are an implied agreement to refrain from doing anything which will destroy or injure the other party's right to receive the fruits of the contract. *Northbrook Bank & Tr. Co. v. 2120 Div. LLC*, 46 N.E.3d 783, 794 (Ill. App. Ct. 2015).

Dr. Cameron cites to record evidence that TCM did not have an outside accountant conduct the reconciliation identified in Section 3.4(d) and did not provide Dr. Cameron with the information necessary to calculate her bonuses. Defs.' Mot. Summ. J. Ex. 7 Teverbaugh Dep. (D. 48-6 at ECF pp. 17-18) at 62:21-65:17 ("How do you know these calculations were ever performed?" Dr. Teverbaugh: "Because we would do them ourselves."); Pl.'s Mot. Summ. J. Ex. 4 Pettry Dep. (D. 46-6 at ECF p. 53) at 563:15-22 ("I think she [Dr. Teverbaugh] was resistant to give them the information. I used to provide monthly reports to all the providers based on what their receipts were during that month and I was advised by Dr. Teverbaugh that I was no longer allowed to show those reports to any of the providers other than Teverbaugh, Croland, and Mueller."). The Defendants'

dispute, on the other hand, is merely based upon their position that Section 3.4(d) provided for nothing more than eligibility to receive a bonus *only if* Dr. Cameron met the requisite productivity standard of bringing in revenue in excess of two times her salary in a given year and if TCM recorded a profit as opposed to a loss for the given year. Their cited evidence does not directly contradict Dr. Cameron's statements of fact in this regard which precludes the Court finding that there exists a material dispute of fact. Much of the Defendants' cited evidence (and other cited evidence) is Dr. Teverbaugh's opaque deposition testimony which included, among other things, her representations that "I never specifically handed [Dr. Cameron] a report, no[,]" and "There was not an individual document [that reflected the Section 3.4(d)(i) calculation]." Defs.' Mot. Summ. J. Ex. 7 Teverbaugh Dep. (D. 48-6 at ECF pp. 13-14). Dr. Cameron is entitled to summary judgment insofar as Count V pertains to TCM's breach of contract due to its failure to direct its accountant to conduct a reconciliation.

As for TCM's alleged breach of Section 3.4(e) pertaining to shares and distributions, Dr. Cameron argues, like Section 3.4(d), Section 3.4(e) uses the unequivocal terms "shall" and "is" and does not include any discretionary language. She further points out that she performed the conditions set forth in Section 3.4(e), entitling her to additional shares on January 1st of 2017, 2018, 2019, and 2020. She contends that the Defendants' assertion that a subscription agreement was required to subscribe shares is a red herring where the 2016 Agreement does not require the execution of any subscription agreement, in addition to the fact that the Defendants never presented Dr. Cameron with a subscription agreement. The Defendants argue the 2016 Agreement "clearly" contemplated Dr. Cameron take action to subscribe to 48 shares at the same time she executed the 2016 Agreement. The parties present evidence indicating the Defendants fumbled as to their obligation to present Dr. Cameron with a

subscription agreement (Dr. Cameron) and Dr. Cameron acknowledged she needed to execute the subscription agreement in subsequent communications with her counsel (Defendants).

The Court need not consider the extrinsic evidence presenting a dispute of fact. A contract is not rendered ambiguous "simply because the parties disagree upon its proper construction." *Asta, L.L.C.*, 629 F. Supp. 2d at 846 (citing *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 888 N.E.2d 657, 662 (Ill. App. Ct. 2008)). "Rather, an ambiguous contract is 'an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." *Id.* Section 3.4(e) here reveals none of those things. The first sentence of Section 3.4(e) of the 2016 Agreement states clearly, "*Simultaneous* with the execution of this Agreement, Physician *is* subscribing for 48 shares of the Corporation." Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF p. 5) (emphasis added). That sentence leaves no question that Dr. Cameron was to become a shareholder upon execution of the 2016 Agreement without any further action necessary on her part. The undisputed evidence is that TCM did not transfer any shares to Dr. Cameron. Pl.'s Mot. Summ. J. Ex. 4 Pettry Dep. (D. 46-6 at ECF pp. 66-67) at 65:8-66:1.

Dr. Cameron requests specific performance as the remedy for TCM's breach of contract. "It is well settled that specific performance is an extraordinary remedy and will only be invoked where the plaintiff is without an adequate remedy at law and where it is feasible for the court to enforce such a remedy." *Abrams v. Rapoport*, 516 N.E.2d 943, 946 (Ill. App. Ct. 1987). Dr. Cameron has not argued, nor can she establish, that an award of money damages is inadequate. In addition, as a result of Section 4.2(h) of the 2016 Agreement, specific performance would accomplish nothing. Section 4.2(h) provides:

> If Physician ceases to fully perform either obstetrics or gynecological services at any time, this Agreement shall be terminated, *Physician will*

23

*no longer be a shareholder of the Corporation*, and if both parties wish, the Physician and Corporation will endeavor to negotiate a new employment agreement for Physician's service as a non-shareholder employee.

Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF p. 8) (emphasis added). It is undisputed that, pursuant to Section 4.2(b) of the 2016 Agreement[7], on April 13, 2020, Dr. Cameron provided 60-days' written notice to TCM that she was resigning from her employment with TCM, and her last day of employment with TCM would be June 12, 2020. Defs.' Resp. Ex. 18 (D. 54-5). She nevertheless argues that she is still practicing, so Section 4.2(h) cannot serve as a basis to strip her of shareholder claims. Proper contract construction certainly does not support such an argument. A contract must be given a fair and reasonable interpretation based on consideration of all its language and provisions. *Shelton*, 478 N.E.2d at 314. Both Section 4.2(b) and 4.2(h) appear under the heading "Term, Termination and Consideration for Shareholder Status." Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF p. 6). Given the last sentence of Section 4.2(h), the parties plainly agreed to Dr. Cameron's shareholder status being conditioned upon her performance of either obstetrics or gynecological services *for TCM*. As Dr. Cameron resigned from her employment with TCM in June 2020 – she ceased to fully perform either obstetrics or gynecological services for TCM in June 2020 – the 2016 Agreement was terminated as contemplated by Section 4.2(h). Simply put, Dr. Cameron stopped being a shareholder upon her resignation of employment on June 12, 2020, rendering it infeasible to enforce her requested remedy of specific performance.

---

[7] Section 4.2(b) provides, in relevant part: "Notwithstanding anything herein to the contrary, either party may terminate this Agreement upon sixty (60) days written notice to the other party . . . ." Defs.' Mot. Summ. J. Ex. 2 (D. 48-1 at ECF p. 6).

## IV

For the reasons set forth *supra*, Plaintiff's Motion for Partial Summary Judgment (D. 46) is GRANTED IN PART AND DENIED IN PART and Defendants' Motion for Partial Summary Judgment (D. 47) is GRANTED IN PART AND DENIED IN PART.  The Plaintiff's Motion for Partial Summary Judgment is granted as to Defendants' liability for Counts I through III and V and is denied as to Count IV.  The Defendants' Motion for Partial Summary Judgment is denied as to their liability for Counts I through III and V and is denied as to Count IV.  The Defendants' Motion for Partial Summary Judgment is granted as to the Plaintiff's would-be IWPCA claim premised upon the violation of Section 3.4(e) of the 2016 Agreement.  Dr. Cameron is granted leave to submit a petition for interest and attorneys' fees for the Defendants' violation of Section 3.4.  Via separate order, the Court will set this matter for a status conference to discuss:  1) a briefing schedule for *Daubert* motions; 2) setting this matter for trial as to Defendant Mueller's liability; and 3) setting this matter for trial on damages as to Section 3.4(d) and 3.4(e) of the 2016 Agreement.

Should a party file a motion for reconsideration which is subsequently denied by the Court, the party who filed the motion will be responsible for the attorneys' fees of the opposing party related to their response to the motion for reconsideration.

*It is so ordered.*

Entered on July 20, 2026

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE